K. C. WU, Plaintiff,

v.

Barnaby C. KEENEY et al., Defendants.

Civ. A. No. 886–73.

United States District Court,
District of Columbia.

Oct. 17, 1974.

K. C. Wu, pro se.

Earl J. Silbert, U. S. Atty., Arnold T. Aikens, and Peter R. Reilly, Asst. U. S. Attys., Washington, D. C., for defendants.

## MEMORANDUM OPINION

WADDY, District Judge.

Plaintiff brings this action against three past and present officials of the National Endowment For The Humanities [1] [Endowment] and five unnamed "outside reviewers," experts serving the Endowment in an unremunerated capacity, alleging that defendants conspired and made fraudulent representations which damaged plaintiff's reputation. The claim arose out of the Endowment's rejection of plaintiff's application for a $70,000 grant to write the first volume of a proposed three volume history of China. Plaintiff has not sued the Endowment *eo nomine* to review its decision, but alleges instead that the defendants made fraudulent and defamatory statements in their "individual and private" capacities. The defendant officials of the Endowment are represented, however, by the United States Attorney in his official capacity. The case is now before the Court on defendant Emerson's objection to a recommendation of the Pre-Trial Examiner and on the defendants' motion for judgment on the pleadings or, in the alternative, for summary judgment. The material facts being undisputed, the Court concludes, for the reasons set forth below, that

---

1. 20 U.S.C. § 951 et seq. The Endowment is one of the components of the National Foundation on the Arts and the Humanities consisting of a National Endowment for the Arts, a National Endowment for the Humanities, and a Federal Council on the Arts and the Humanities.

summary judgment should be granted in favor of defendants and that defendants' objections to the recommendation of the Pre-Trial Examiner should be sustained.

## I.

Plaintiff is a naturalized citizen of the United States, born and raised in China, who received his college and graduate education in this country (degrees from Grinnell College and Princeton University). Upon completion of his studies in the United States, plaintiff returned to China to serve in various positions in the Chinese government. Mr. Wu became a resident of this country in 1953 and was employed here as a lecturer and writer. In 1965 he was appointed professor at Armstrong State College, Savannah, Georgia.

In 1970 Mr. Wu applied to the Endowment for his grant, contending that most histories of China written by American historians were replete with factual inaccuracies and that he was one of the few persons with both a "classical" Chinese education and an understanding of the American political system who could author a comprehensive history of his homeland. In keeping with routine procedures, defendant Emerson, Director of the Division of Research Grants of the Endowment, referred plaintiff's proposal to the five unnamed "outside reviewers," each of whom is an expert in Chinese history and a university professor. Four of the experts submitted written reviews recommending rejection of the proposal. The fifth reviewer also recommended rejection in an oral review of the application and requested that his comments be kept confidential.

The application was next referred to a panel of consultants who are experts in the "humanities." [2] This panel also recommended rejection of Mr. Wu's application, a conclusion which was, in turn, supported by a committee of full-time staff members of the Endowment. The members of the panel of experts and the staff committee assigned a rating to plaintiff's application which placed it in a category of proposals which were of "poor quality" and which "would not be funded even if adequate funds were available to support all applications presented to the Endowment." [3] The final step in the review process occurred on May 22, 1970, when the National Council for the Humanities recommended rejection of the application. On May 27, 1970 defendant Keeney, then Chairman of the Endowment, informed Mr. Wu in writing of the rejection of his application.

Plaintiff responded to his rejection by requesting from Mr. Keeney "all the criticisms and objections that have been expressed against the project by your expert consultants, or your panel of highly competent judges, or by the National Council of Humanities, without disclosing their identities." [4] Keeney replied in a letter dated June 4, 1970:

> The comments made by our reviewers are, of course, a matter of confidence between themselves and the Endowment. Speaking generally I can say that they felt that your training was not equal to the task which you have set yourself and that the proposed costs were excessive in view of the many other demands on the Endowment's limited resources.[5]

---

2. 20 U.S.C. § 952 defines "humanities" to include

"the study of the following: language, both modern and classical; linguistics; literature; history; jurisprudence; philosophy; archeology; comparative religion; ethics; the history, criticism, theory, and practice of the arts; those aspects of the social sciences which have humanistic content and employ humanistic methods; and the study and application of the humanities

to the human environment with particular attention to the relevance of the humanities to the current conditions of national life."

3. Affidavit of William R. Emerson, October 30, 1973.

4. Letter from K. C. Wu to Barnaby C. Keeney, June 2, 1970.

5. Letter from Barnaby C. Keeney to K. C. Wu, June 4, 1970.

In a subsequent correspondence, dated June 26, 1970, Keeney advised Wu that "[t]he reviewers were not impressed by your criticisms of the scholarship of Western sinologues and they did refute them." Not satisfied with these explanations, plaintiff formally petitioned the Endowment to reconsider its decision, citing as grounds therefor that the China specialists who initially reviewed his application were not competent to judge his proposal and that their service as reviewers for the Endowment entailed a conflict of interest. Defendant Edgerton, Keeney's successor as Chairman of the Endowment, informed Wu on July 7, 1970 that his request for reconsideration had been denied.

Plaintiff's next tactic was to file an action in the United States District Court for the Southern District of Georgia under the Freedom of Information Act, 5 U.S.C. § 552, to compel the Endowment to disclose its records containing the comments of the five China specialists. The District Court granted summary judgment for the Endowment and the Circuit Court of Appeals affirmed. Wu v. National Endowment for Humanities, 460 F.2d 1030 (5th Cir. 1972), cert. denied, 410 U.S. 926, 93 S. Ct. 1352, 35 L.Ed.2d 586 (1973). The Court of Appeals held that the requested materials were intra-agency memoranda, a part of the Endowment's "deliberative processes," and, therefore, exempt from public disclosure pursuant to subsection (b)(5) of the Act.[6]

Undaunted by this setback, Mr. Wu filed the instant action. He seeks to avoid the ruling of the Fifth Circuit by bringing the instant action against the defendants in their individual capacities allegedly for "fraud and conspiracy." The crux of his claim is that the previously quoted comments made by defendant Keeney in his letters of June 4, 1970 and June 26, 1970 were false and fraudulent representations designed "de-liberately and maliciously to damage his [plaintiff's] reputation." Plaintiff further alleges that these statements evidence a conspiracy on the part of the eight defendants to commit a fraud and to defame plaintiff.

After the filing of the suit plaintiff, pursuant to Rule 33 of the Federal Rules of Civil Procedure, served on defendant William R. Emerson, the Director of the Endowment's Division of Research Grants, the following three interrogatories:

1. Give the names, the home address and the office address of each of the five "outside reviewers" to whom the National Endowment For the Humanities referred the application of K. C. Wu, the Plaintiff herein.

2. Give a curriculum vitae for each of the above said reviewers, with special emphasis on their training and expertise in reading and writing in the Chinese language, both vernacular and classical. Has any one of them written or published any article, essay, or book in Chinese? If so, give the title, the date and place of publication in each instance.

3. What is the name of the one reviewer who only gave an oral review to the Endowment?

Defendant Emerson did not respond to the interrogatories within the time provided by the Rules and plaintiff moved to compel answers. Thereupon Emerson filed objections to the interrogatories and opposition to plaintiff's Motion to Compel. Attached to Emerson's opposition is an affidavit in which he states in response to the three interrogatories:

1. He is unable to give the information requested in this Interrogatory without reference to the records which the Plaintiff sought to inspect by an action brought in the United States Court for the Southern District of Georgia, Savannah Division, Civil Ac-

---

6. The Freedom of Information Act exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency . . . ." 5 U.S.C. § 552(b)(5).

tion File No. 2754, entitled K. C. Wu vs National Endowment for the Humanities and Wallace B. Edgerton as Acting Chairman for the National Endowment for the Humanities Defendants. The Plaintiff was denied access to these records by judgment of the United States District Court, and this judgment was affirmed on appeal by the United States Court of Appeals for the Fifth Circuit on May 2, 1972. (460 F.2d 1030, 1972).

2. Same reply as to No. 1.

3. Same reply as to No. 1.

The motion to compel and opposition thereto were referred to the Pre-Trial Examiner pursuant to Rule 3–9 of this Court. The Pre-Trial Examiner recommended that Emerson be ordered to answer Interrogatory Number 1, and that the objections to Interrogatories 2 and 3 be sustained. Defendant Emerson, has objected to the first portion of the Recommendation and that objection is now before the Court.

While the Court was considering the objection of defendant Emerson to the recommendation of the Pre-Trial Examiner the defendants filed their motion for judgment on the pleadings or, in the alternative, for summary judgment.

## II.

Defendant Emerson objects to the recommendation of the Pre-Trial Examiner which would require him to give to plaintiff the names, home addresses, and office addresses of the "outside reviewers," on two grounds: *first*, he is unable to ascertain the information sought without reference to records to which

plaintiff was denied access in Wu v. Endowment For Humanities, *supra*, and, *second*, the information sought is confidential and privileged and thus inappropriate for discovery.[7]

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides, in pertinent part:

Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . including . . . the identity and location of persons having knowledge of any discoverable matter.

The exemption of privileged matters in this provision should be interpreted in light of the specific requirements of the Freedom of Information Act. See Environmental Protection Agency v. Mink, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973); [8] cf. Committee for Nuclear Responsibility v. Seaborg, 149 U.S.App.D. C. 380, 463 F.2d 783 n. 16 (1971).

Additional attention must be given to 18 U.S.C. § 1905, which prohibits officers or employees of federal agencies from disclosing certain information obtained in the course of their employment. Although plaintiff has sued defendants in their individual capacities, these interrogatories request information available to defendants only because of their positions as officials of the Endowment. Furthermore, the claimed conspiracy which plaintiff alleges appears to have taken the form of correspondence between defendants in the course of performing their duties as Endowment officials. Defendant Emerson's susceptibility to criminal sanctions

---

7. Because it might be argued that the information requested by plaintiff in his interrogatories, if discoverable, should be available to him in preparing a response to the motion for summary judgment, the Court feels it is appropriate to consider initially the issues raised by the objections to the Pre-Trial Examiner's recommendation, before it reaches the merits of defendants' motion for judgment on the pleadings or, in the alternative, *for summary judgment.*

8. The Court in *Mink* stated that exemption (5) of the Freedom Act:

cannot be read as suggesting that *all* factual material was to be rendered exempt from compelled disclosure. . . . It appears to us that Exemption 5 contemplates that the public's access to internal memoranda will be governed by the same flexible commonsense approach that has long governed private parties' discovery of such documents involved in litigation with Government agencies. 410 U.S. at 91, 93 S.Ct. at 838.

under this statute is to be considered in conjunction with the Freedom of Information Act. Grumman Aircraft Engineering Corp. v. Renegotiation Board, 138 U.S.App.D.C. 147, 425 F.2d 578, 580 n. 5 (1970); M. A. Schapiro & Co. v. Securities and Exchange Commission, 339 F.Supp. 467 (D.D.C.1972).

Taking account of the above considerations, it is the opinion of this Court that plaintiff is not entitled to the names and personal data of the Endowment's consultants and that defendant Emerson's objections to the recommendation of the Pre-Trial Examiner should be sustained for the reasons explained below.

■■■ First, resolution of this issue in defendant's favor is suggested by the cases arising under the Freedom of Information Act, the focal point about which both Rule 26(b) and 18 U.S.C. § 1905 must be viewed. The principles of public policy which underlie exemption (5) of the Act have been subjected to judicial scrutiny in a variety of factual contexts and by a number of the circuit courts of appeal.[9] In brief, this exemption is designed to protect the confidentiality of an agency's internal, decision-making processes. Memoranda containing advisory comments are protected from disclosure in order to "encourage the free exchange of ideas during the process of deliberation and policy-making." Soucie v. David, 145 U.S.App.D.C. 144, 448 F.2d 1067, 1077 (1971). Even factual material may be protected from disclosure if contained within a document which is otherwise exempt under the Act and if the divulgence of the factual matters would hamper the agency's deliberative process. Montrose Chemical Corporation of California v. Train, 491

F.2d 63 (D.C.Cir. 1974). This analysis is extended to government consultants on the ground that "those individuals should be able to give their judgments freely without fear of publicity." Soucie v. David, 448 F.2d at 1078, n. 44.

■■■ Although the identities and addresses of the Endowment's outside reviewers could be construed as purely factual items which would not be exempt under the Freedom of Information Act, the rationale of *Montrose* makes a compelling argument against disclosure.[10] The Endowment's need to engage special consultants is clear. Decisions must be made concerning technical or specialized disciplines within the humanities. Many of these decisions, involving large sums of money, may depend upon the evaluation of differing subjective points of view. The Fifth Circuit Court of Appeals has already observed that the community of Chinese scholars is very small.[11] To expose those persons to Mr. Wu's harassment would certainly jeopardize the Endowment's ability to stimulate the "free exchange of ideas" necessary to effectuate its statutory functions.

Applying the flexible approach suggested in *Mink*, the Court has considered the Endowment's activities, the role played by the consultants and the nature of the information sought in light of the public policy considerations supporting exemption (5) of the Freedom of Information Act and Rule 26(b) of the Federal Rules of Civil Procedure. Non-disclosure of the information in question would be most consistent with these considerations.

■■■ A second mode of analysis— viewing plaintiff's request for information solely in the context of discovery

---

9. Cases in this circuit include Montrose Chemical Corporation of California v. Train, 491 F.2d 63 (D.C.Cir.1974); Soucie v. David, 145 U.S.App.D.C. 144, 448 F.2d 1067 (1971); Bristol-Myers Co. v. F. T. C., 138 U.S.App.D.C. 22, 424 F.2d 935 (1970).

10. See also M. A. Schapiro & Co. v. S. E. C., 339 F.Supp. 467 (D.D.C.1972) in which the court observed that it may be necessary to

delete identifying references in otherwise disclosable agency reports in order to protect the integrity of persons engaged in discussions with the agency. Cf. Sears, Roebuck & Co. v. N. L. R. B., 346 F.Supp. 751 (D.D.C.1972).

11. Wu v. National Endowment For Humanities, 460 F.2d at 1034.

under the Federal Rules—leads to a like conclusion. This Court cannot overlook the fact that plaintiff's allegations are extremely vague and conclusory. Although he claims fraud as a basis for this action, plaintiff has not alleged facts which would establish the necessary elements to support such a claim, as to either the named or unnamed defendants. See United States v. Kiefer, 97 U.S.App.D.C. 101, 228 F.2d 448 (1956), cert. denied, 350 U.S. 933, 76 S. Ct. 305, 100 L.Ed. 815, rehearing denied, 350 U.S. 977, 76 S.Ct. 431, 100 L.Ed. 847.[12] Plaintiff's reference to defamatory conduct on the part of defendants is similarly averred in incomplete and conclusory terms.[13] Plaintiff may not rectify these inadequacies in his pleadings by asserting equally vague claims of conspiracy; a conspiracy alone does not give rise to a claim for relief unless accompanied by an overt act and carried out to achieve an unlawful end. Edwards v. James Stewart & Co., 82 U.S. App.D.C. 123, 160 F.2d 935 (1947).

 It is within the discretion of the court to deny the use of discovery as a "fishing expedition based on an unsupported and nebulous allegation of criminal conspiracy." Chung Wing Ping v. Kennedy, 111 U.S.App.D.C. 106, 294 F. 2d 735, 737 (1961), cert. denied, 368 U.S. 938, 82 S.Ct. 380, 7 L.Ed.2d 337. The discovery sought by plaintiff in this case appears to be little more than a "fishing expedition." In fact, plaintiff's supporting memoranda belie the fact that he is pursuing common law claims for fraud or defamation.[14] To the contrary he gives every indication that he is using this suit as a collateral means of questioning the Endowment's original decision not to approve his request for a grant. In this light it is appropriate to deny plaintiff the discovery he seeks.

For each of the two reasons discussed the objections of defendant Emerson to the recommendations of the Pre-Trial Examiner are sustained.

### III.

Defendants raise two arguments in support of their motion for summary judgment: insufficiency of service of process and official immunity. Each point is discussed separately below.

#### Service of Process

Service of process must be effected in a manner consistent with Rule 4(f) of the Federal Rules of Civil Procedure, which requires service to be made within the territorial limits of the state in which the district court is held, except when extra-territorial service is authorized by statute or another federal rule. Defendants assert, and plaintiff does not contest, that service was made on defendant Keeney in California, defendant Edgerton in New York and defendant Emerson in Maryland. Service of proc-

12. The elements of civil fraud are: "(1) a false representation (2) in reference to a material fact (3) made with knowledge of its falsity (4) and with the intent to deceive (5) with action taken in reliance upon the representation. Pence v. United States, 316 U.S. 332, 338, 62 S.Ct. 1080, 86 L.Ed. 1510 (1942).

13. See Hearst Radio v. Federal Communications Commission, 83 U.S.App.D.C. 63, 167 F.2d 225, 226–27 (1948). Libel constitutes "[t]he publication of misrepresentations, known to be false, which subject a person to public shame and ridicule and cause him damage . . . ."

14. In plaintiff's memorandum of points and authorities, filed September 26, 1973, he states that he is prepared to proceed against the three named defendants even if the con-

sultant's identities are not revealed. He adds:

> However, in that event, it is also foreseeable that these three defendants will have to meet with some difficulties, if they persist in refusing to name the five reviewers now, it may well be that they cannot use t'em as expert witnesses later in the trial. If they cannot produce these reviewers to contradict Plaintiff's evidence [sic] and arguments, Plaintiff doubts if they can muster up any other China specialists in their defense.

Plaintiff's mention of defendants' need for China specialists as expert witnesses suggests that his claim is directed to the funding for his proposed history of China and not to the issues of alleged fraud and conspiracy.

ess in this action was clearly improper unless some statute carves out an exception to the territorial limitations of Rule 4(f).

In 1962 Congress did enact legislation which affected the means by which service may be made on government officials.[15] In addition to conferring on the district courts original jurisdiction of actions in the nature of mandamus (28 U.S.C. § 1361) the legislation added subsection (e) to the general venue provisions of section 1391 of Title 28:

> A civil action in which each defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, may, except as otherwise provided by law, be brought in any judicial district in which: (1) a defendant in the action resides, or (2) the cause of action arose, or ·(3) any real property involved in the action is situated, or (4) the plaintiff resides if no real property is involved in the action.

> The summons and complaint in such an action shall be served as provided by the Federal Rules of Civil Procedure except that the delivery of the summons and complaint to the officer or agency as required by the rules may be made by certified mail beyond the territorial limits of the district in which the action is brought.

Although defendants do not refer to the possible applicability of this provision to the issue of proper service of process, their memorandum in support of summary judgment suggests that because plaintiff has brought a private, tort action for damages, and not an action for review of an agency decision, he is bound by the requirements of territorial service in Rule 4(f). This argument unfortunately conflicts with the legislative history accompanying the enactment of section 1391(e). Both the House and Senate Reports contain the following comment with respect to the kinds of actions covered by the statute:

> The venue problem also arises in an action against a Government official seeking damages from him for actions which are claimed to be without legal authority but which were taken by the official in the course of performing his duty.[16]

 Plaintiff alleges that he was injured as a result of defendants' fraudulent and defamatory statements, made in the course of their official duties. This claim, while probably not specifically contemplated by Congress, appears to fall within the bounds of section 1391(e). Accordingly the Court concludes that service of process on defendant Emerson was properly made pursuant to Rule 4(f) and section 1391(e). However, subsection (e) refers to actions in which "each defendant is an officer or employee of the United States or any agency thereof . . . ." Nothing in the legislative history indicates that Congress intended to include *past* employees who are being sued for damages in the category of persons subject to extra-territorial service. For this reason, the Court concludes that service of process on defendants Keeney and Edgerton was not proper in light of the fact that they, unlike defendant Emerson, were no longer employed by the Endowment at the time when this action was filed;[17] the claims against these two defendants will, therefore, be dismissed for lack of jurisdiction of the persons.

*Official Immunity*

Defendants' contention that the doctrine of official immunity bars the maintenance of this action is premised

---

15. Act of Oct. 5, 1962, Pub.L.No. 87–748, § 2, 76 Stat. 744, amending 28 U.S.C. § 1391.

16. H.R.Rep.No. 536, 87th Cong., 1st Sess. 3 (1962); S.Rep.No. 1992, 87th Cong., 1st Sess. (1962), U.S.Code Cong. & Admin. News, p. 2786.

17. See Affidavits of Barnaby C. Keeney, dated October 10, 1973, and Wallace B. Edgerton, dated October 17, 1973.

on the Supreme Court's decision in Barr v. Mateo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959). The Court held in that case that a press release issued by the head of a government agency and in the course of his duties was protected by an absolute privilege from suit alleging that statements in the press release were maliciously made, with the intent to defame plaintiffs. The Court offered the following explanation for this immunity:

> It has been thought important that officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties—suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government.[18]

▮ The courts have not adopted a rigid view of immunity, however, in all cases involving alleged misconduct by government officials. Most courts have approached the problem on an ad hoc basis, focusing on the distinction between official acts which are ministerial in nature, as opposed to those which are discretionary. See Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); Carter v. Carlson, 144 U.S. App.D.C. 388, 447 F.2d 358 (1971), rev'd on other grounds sub nom., District of Columbia v. Carter, 409 U.S. 418, 93 S. Ct. 602, 34 L.Ed.2d 613 (1973). While official functions requiring the exercise of discretion are immune from civil liability, ministerial acts are not privileged. The line dividing the two categories is not always clearly defined, as observed by this Circuit's Court of Appeals in Carter v. Carlson, *supra,* a case in which official immunity was held not to be available to police officers accused of misconduct:

> [I]n determining whether a particular government function falls within the scope of official immunity, it does not suffice to consider simply whether the officer has "discretion" in the sense that he exercises judgment in choosing among alternative courses of action. The proper approach is to consider the precise function at issue, and to determine whether an officer is likely to be unduly inhibited in the performance of that function by the threat of liability for tortious conduct.[19]

▮ The duties of the Endowment are an example of governmental functions which, in this Court's view, clearly are committed to agency discretion and which require unfettered leeway on the part of the agency's officials and reviewers to express their opinions. This view of the agency's operations may be gleaned from the statute itself:

> (c) The Chairman [of the Endowment], with the advice of the National Council on the Humanities . . . is authorized to—
>
> > (1) develop and encourage the pursuit of a national policy for the promotion of progress and scholarship in the humanities;
> >
> > * * * * * *
> >
> > (4) foster the interchange of information in the humanities;
> >
> > (5) foster, through grants of other arrangements with groups, education in, and public understanding and appreciation of the humanities
>
> . : .
>
> (d) The Chairman shall correlate the programs of the National Endowment for the Humanities, insofar as practicable, with existing Federal programs, designated State humanitiers agencies and with those undertaken by other public agencies or private groups, and shall develop the programs of the Endowment with due regard to the contribution to the objectives of this chapter which can be made by other Federal agencies under existing programs.[20]

18. 360 U.S. at 571, 79 S.Ct. at 1339.

19. 447 F.2d at 362.

20. 20 U.S.C. § 956(c), (d).

The officials and specialists retained by the Endowment to carry out this statutory mandate must pass judgment on a wide variety of proposals for funding, taking into account not only the merits of each individual project, but also the overall goals of the National Foundation. Although the duty to review applications for grants might be deemed ministerial, the process by which the applications are reviewed require a give-and-take of opinions between Endowment officials, reviewers, consultants, etc. The resultant decisions must be characterized as discretionary.

The problem of retaining the services of these consultants has already been discussed in the context of plaintiff's motion to compel answers to interrogatories. The analysis applicable there, especially the considerations enunciated by the Fifth Circuit in *Wu*, are equally appropriate to the issue of official immunity. The views of the consultant's and Endowment staff must be expressed in an atmosphere free of outside pressures and without fear that opinions will later be subject to public obloquy. The potential inhibiting effect is not illusory and would be enhanced even further if persons involved in the decision-making process were subjected to the possibility of civil liability merely for the expression of their opinions.

The mode of analysis prescribed by the Courts in *Scheuer* and *Carter* leads to the conclusion that the communications which lie at the heart of this litigation are part of a "deliberative process" which can operate effectively only if immune from the dangers presented by damage actions initiated by applicants who are offended by the agency's evaluation of their work. Neither the allegation of defamation nor the assertion of the malicious intent with which it was accomplished can affect the conclusion that defendants' actions were part of their discretionary functions and, therefore, entitled to immunity. *Cf.* Barr v. Mateo, *supra*; Norton v. McShane, 332 F.2d 855 (5th Cir. 1964); Laughlin v. Garnett, 78 U.S.App.D.C. 194, 138 F.2d 931 (1943). Similarly unavailing is plaintiff's reliance on the allegations that the Endowment's officials and reviewers engaged in a *conspiracy* to defame plaintiff. This purported conspiracy necessarily encompasses the very process of deliberation (i. e., the exchange of ideas) which gives rise to the privilege. If the defamation itself cannot overcome the defense of immunity, then neither can allegations of a conspiracy to that end.[21]

Based upon the foregoing, this Court has concluded that there exists in this case no genuine issue of a material fact and that defendants are entitled to judgment as a matter of law.

### JUDGMENT

Upon consideration of the defendants' objection to the recommendation of the Pre-Trial Examiner, the memoranda of points and authorities in support thereof and the opposition thereto, and upon further consideration of defendants' motion for judgment on the pleadings or, in the alternative, for summary judgment, the memoranda of points and authorities in support thereof and the opposition thereto, and it appearing to the Court, for the reasons set forth in the accompanying Memorandum Opinion, that defendants' objections to the recommendation of the Pre-Trial Examiner should be sustained and it further appearing that service of process on defendants Keeney and Edgerton was insufficient, and that the complaint, as to them, should be dismissed for lack of ju-

---

21. The question may be raised whether the allegations of fraud would be sufficient to overcome initially the protection of official immunity; fraudulent acts could be characterized as unauthorized conduct not entitled to the privilege. However, consideration of this issue is premature, at this time, in light of plaintiff's failure to allege properly a claim for fraud upon which relief might be granted. See United States v. Kiefer, 97 U.S.App.D.C. 101, 228 F.2d 448 (1936), cert. denied, 350 U.S. 933, 76 S.Ct. 305, 100 L.Ed. 815 (1956); McCarthy v. Cahill, 249 F. Supp. 194 (D.D.C.1966).

risdiction over the persons, and it further appearing that defendant Emerson is entitled to judgment as a matter of law, it is by the Court this 17th day of October, 1974,

Adjudged, ordered and decreed that defendants' objection to the recommendation of the Pre-Trial Examiner be, and the same hereby is, sustained, and it is further

Adjudged, ordered and decreed that, as to defendants Keeney and Edgerton, the complaint be, and the same hereby is, dismissed for lack of jurisdiction over the persons, and it is further

Adjudged, ordered and decreed that defendants' motion for summary judgment be, and the same hereby is, granted and that this cause be, and the same hereby is, dismissed.