Nos. 37,798 and 37,827 Consolidated

ORRIN L. BROWNING and ROSALEE M. BROWNING, *Appellees, v.*
W. A. BLAIR, HOWARD C. KING, and LILLIAN L. B. KING, *Appelllants* (Willis K. Dillenberger, Defendant).

(218 P. 2d 233)

Opinion filed May 6, 1950.

*Elmer W. Columbia* and *Glenn Jones,* both of Parsons, argued the cause, and *John B. Markham* and *Herman W. Smith, Jr.,* also of Parsons, were with them on the briefs for the appellants.

*Jack L. Goodrich,* of Parsons, argued the cause, and *L. E. Goodrich,* also of Parsons, was with him on the briefs for the appellees.

The opinion of the court was delivered by

WERTZ, J.: This case involves two appeals, the first from an order of the lower court appointing a receiver, and the second from an order overruling the demurrers to plaintiffs' amended petition. We will treat the appeals in order.

The *Chetopa Advance,* a newspaper published in the town of Chetopa, was formerly owned by Howard C. and Lillian L. B. King; the plaintiffs Orrin L. Browning and Rosalee M. Browning, husband

and wife, purchased the newspaper and equipment on January 30, 1945, under a conditional sale contract signed by both the Brownings and a copy attached to their petition, under the terms of which plaintiffs agreed to pay Kings the sum of $7,500 as therein specified, $1,000 on the date the contract was executed, and the balance of $6,500 payable in 120 equal monthly installments beginning on July 10, 1945, and continuing until the balance of the principal and interest was paid. It was mutually agreed that possession of the property be given to plaintiffs subject to the terms of said contract, and that the property was not to be repossessed by Kings unless there were as many as four payments delinquent thereon; but in the event four or more payments should become delinquent and unpaid, the plaintiffs agreed to surrender and deliver possession of the property to the Kings and upon their failure to do so, Kings might proceed by any lawful means to obtain possession thereof, and all sums paid by plaintiffs were to be retained by Kings as liquidated damages for failure of performance and use of the property. Title to any additions or replacements of the property or equipment was to vest immediately in Kings and pass to plaintiffs only on their performance of the contract. Plaintiffs were to maintain the property in good condition and operate it as a going concern, pay all taxes levied against the property and maintain insurance at all times in the total amount of $4,000 to protect the Kings. Time was made the essence of the contract and it was further provided that any indulgences granted by the Kings should not constitute a waiver of any of their rights under the contract. No waivers or modifications were to be valid unless written upon or attached to this contract and signed by the parties. Title to the property was to remain in the Kings until all sums due under the contract had been fully paid, and the contract could be negotiated or assigned, or payment thereof renewed or extended without title passing to the Brownings.

The plaintiffs Browning defaulted in this contract and on October 30, 1948, an extension agreement between the Brownings and Kings was executed, and a copy thereof was made a part of plaintiffs' petition. Pertinent provisions of this extension agreement are: That Kings were owners of the newspaper being operated by the Brownings under a conditional sales contract dated January 30, 1945; that Brownings being delinquent in the payments required under said contract desire an extension thereof. It was agreed there was due from Brownings to Kings the sum of $6,049.96 which represented

the unpaid balance and accrued interest under the original contract; that Brownings should pay such amount to the Kings in equal monthly installments of $78.57, the first installment to be paid November 12, 1948, and the remaining installments on the 12th day of each month thereafter. It was agreed the covenants and agreements of the original conditional sales contract should remain in full effect and that this agreement was for the sole purpose of extending the terms of said contract. It was further agreed that if Brownings defaulted under the terms of this extension agreement, they would lease their building then occupied by the newspaper to the Kings for a term of five years at a monthly rental of $25 and carry insurance for fire and extended coverage upon the equipment in an amount not less than $5,000. The Brownings thereafter did default on the extension agreement, and on April 25, 1949, entered into a contract with W. A. Blair, which contract also was made a part of plaintiffs' petition herein. Provisions of the Blair contract are here quoted:

"EXHIBIT 'C'

"AGREEMENT

"This agreement made and entered into this 25th day of April, 1949, by and between Orrin L. Browning and Rosalee M. Browning, parties of the first part and W. A. Blair, party of the second part;

"WITNESSETH; that whereas the said parties of the first part are the equitable owners of the *Chetopa Advance,* a weekly newspaper and printing shop located in Chetopa, Kansas, by virtue of a certain Conditional Sales Contract with Howard C. King and Lillian L. B. King, holders of the legal title to said newspaper and printing plant, and

"WHEREAS the said parties of the first part are delinquent in their payments under said Conditional Sales Contract, and

"WHEREAS the said Howard C. King and Lillian L. B. King have informed said parties of the first part that they would commence a replevin action to foreclose said Contract, and

"WHEREAS the said party of the second part agrees to purchase the said *Chetopa Advance* together with the real estate in the name of the parties of the first part, for a total sum of Eighty-five hundred ($8500.00) dollars;

"Now THEREFORE it is agreed by and between the parties hereto that in consideration of the payment of $1,486.74, and the assumption of the indebtedness to Howard C. King and Lillian L. B. King under the Conditional Sales Contract aforesaid and the assumption of a certain real estate mortgage in the amount of $1,930.00 upon the real estate occupied by the said *Chetopa Advance,* the said parties of the first part agree to Grant, Bargain and Sell unto the said party of the second part all of their right, title and interest in and to the said *Chetopa Advance,* including all equipment, good will and supplies, and to further convey by Warranty Deed the real estate occupied by the said *Chetopa Advance.*

"It is further agreed by and between the parties hereto that the said party of the second part shall pay to the said parties of the first part the sum of $500.00, upon the signing of this agreement and that the balance shall be due and payable upon the signing of a Conditional Sales Contract between the party of the second part herein and Howard C. King and Lillian L. B. King.

"It is further understood and agreed by and between the parties hereto that out of the balance due the said parties of the first part that the said party of the second part shall pay to Howard C. King and Lillian L. B. King the sum of $500.00 and that the said party of the second part shall obtain a release in full from the said Howard C. King and Lillian L. B. King, releasing the said parties of the first part from any and all liability under the certain conditional sales contract and extension thereof heretofore entered into between the said parties of the first part and the said Howard C. King and Lillian L. B. King.

"It is further understood and agreed by and between the parties hereto that the said parties of the first part shall turn over to the said party of the second part the building, equipment, supplies and good will of the *Chetopa Advance* on the 1st day of May, 1949.

"It is further understood and agreed by and between the parties hereto that the Warranty Deed duly executed shall be deposited with Willis K. Dillenberger, Attorney-at-Law, as escrow agent, and to be held by him until the full purchase price is paid, as before set forth, to the said parties of the first part.

"The said parties of the first part agree to comply with the Kansas Bulk Sales Act and to pay all accounts payable on or before the 15th day of May, 1949.

"IN WITNESS WHEREOF, the parties hereto have hereunto affixed their signatures the day and year first above written.

| | |
|---|---|
| "Signed, W. A. Blair | Signed, ORRIN L. BROWNING |
| Party of the Second | Signed, ROSALEE M. BROWNING |
| Part | Parties of the First |
| | Part" |

Blair took possession of the newspaper and continued its publication for three weeks until May 23, 1949, when this action was commenced by the Brownings, co-owners of the equitable interest in the newspaper. The Brownings, plaintiffs, are residents of the city of Cleveland, Okla. Defendant Blair is a resident of Oswego, Kan. Defendants Howard C. King and Lillian L. B. King, husband and wife, are nonresidents of the state of Kansas whose mail address is Sutton, Neb. Defendant Willis K. Dillenberger is a resident of Oswego, Kan., and has no interest in this case except as escrow holder. The petition alleges in part: That on January 30, 1945, plaintiffs Orrin L. Browning and Rosalee M. Browning entered into a conditional sales contract with the Kings, a copy being made a part of the petition as hereinbefore related, for purchase of the Chetopa news-

paper; thereafter on October 30, 1948, plaintiffs and the Kings entered into a supplemental agreement extending the time for payment of the balance of the purchase price due under the original sales contract. This supplemental contract was also made a part of the petition, its contents having been heretofore related. The petition continued:

"7. That Plaintiff, Orrin L. Browning, became sick and ill in both mind and body and was incapable of carrying on his business in his usual manner. That Plaintiffs did become in arrears in the payments due under said contract. That defendants Howard C. King and Lillian L. B. King were threatening to repossess the property purchased by plaintiffs under said contract. That plaintiffs were indebted to other creditors who were also threatening plaintiffs with lawsuits.

"8. That while plaintiff Orrin L. Browning was both physically and mentally ill the defendant W. A. Blair conspired with the defendants, Howard C. King and Lillian L. B. King to purchase the equitable interest of plaintiffs, under said conditional sale contract. That while plaintiff Orrin L. Browning was in a distressed physical and mental condition and while being oppressed by demands of his creditors, plaintiffs were induced to enter into a sale agreement with the defendant W. A. Blair at and for a price of Eighty-Five Hundred Dollars ($8,500.00)."

Plaintiffs further allege that pursuant to the contract, Blair paid them $500, which money plaintiffs now offer to refund to Blair and tender the same into court; Blair has gone into possession of the property, both real and personal, and is now operating said weekly newspaper and printing business; and defendant Blair and defendants King have concluded their dealings pursuant to the contract marked Exhibit "C." They further allege that after purchasing the property under the original sales contract, they materially enhanced and added to the value thereof, and further:

"11. Plaintiffs allege that said defendant Blair with the aid and assistance of the said Howard C. King and Lillian L. B. King fraudulently conspired together to take advantage of the mental, physical and financial condition of the plaintiff Orrin L. Browning to drive an unconscionable, fraudulent and oppressive bargain. That the consideration for such contract is grossly inadequate, constituting only about one-half the actual value of the real estate and personal property involved."

Plaintiffs then allege that this action is brought to set aside a fraudulent contract for the purchase of real estate and personal property, and unless a receiver is appointed, defendant Blair, now in possession of the property, will dispose of same by removing, selling or depleting it without replacement, to the loss and prejudice of the

plaintiffs. They then pray that the agreement between plaintiffs and defendant Blair and all agreements and instruments of conveyance entered into between the defendants Blair and the Kings be set aside and held void, and that a receiver be appointed to take over the management and control, and the operation of the property involved.

Plaintiffs filed a motion for appointment of a receiver at the time the petition was filed. Hearing on this motion was held on June 11 on notice to defendant Blair only, who opposed the appointment of a receiver. Constructive service not having been completed and defendants King being nonresidents, no notice of the hearing was given them, although they had the largest financial interest in the property involved. At the hearing, Orrin L. Browning, the only witness testifying for plaintiffs, stated that he did not know whether he was alarmed about Mr. Blair not keeping the equipment and everything in good shape. He knew Mr. Blair and his son were experienced newspaper operators; that they had operated a newspaper in Oswego; he had not been in the plant for three weeks, and did not know whether he could tell the court that Mr. Blair was not properly taking care of the plant; he had sent no one to the plant to inquire.

Defendant Blair then moved the court to overrule the application for appointment of a receiver for the reason that plaintiffs had offered nothing whatever to justify the court in appointing a receiver for the property involved. His motion was overruled.

Defendant Blair and his son then testified in their own behalf. Robert L. Blair testified: They had cleaned up the place and substituted worn out parts of machinery with new parts; the machinery was now in good condition; the total value of all the articles turned over to them would be about $30.00; and that he had been in the newspaper business for 25 years. W. A. Blair testified that he took charge of the newspaper on May 1 and printed his first paper there on May 5; he could assemble a plant comparable to this newspaper plant for $5,000; he paid Browning $8,500 and to date had paid $2,100 on the purchase price; the plant was in better condition than when turned over to him; they were now getting out an eight-page paper where before the publisher got out a four-page paper.

The court thereupon sustained the application for appointment of a receiver, from which order defendant Blair has appealed to this court assigning as error (1) the order overruling appellant's motion to dismiss the application for appointment of a receiver; and (2) the order appointing a receiver in the above cause.

Plaintiffs base their right to a receiver on that part of G. S. 1935, 60-1201 which reads:

"A receiver may be appointed . . .

"*First:* In an action by a vendor to vacate a fraudulent purchase of property . . . or between . . . [parties] . . . jointly owning or interested in any property . . . on the application of the plaintiff or of any party whose right to or interest in the property . . . or the proceeds thereof is probable, and where it is shown that the property . . . is in danger of being lost, removed or materially injured."

. Defendant Blair complains that plaintiffs did not bring themselves within the provisions of this statute.

The rule has been stated that the power to appoint a receiver is limited almost exclusively to cases where it is necessary in order to prevent fraud, to save the subject of litigation from material injury, or to rescue it from threatened destruction. It is not properly exercised in any case where there is no fraud or imminent danger of the property sought to be reached being lost, injured, diminished in value, destroyed, wasted or removed from the jurisdiction. (45 Am. Jur. 32, § 30; *Elwood v. National Bank,* 41 Kan. 475, 21 Pac. 673.)

At no place in this record is it disclosed or even intimated that the property in question was in danger of being lost, removed or materially injured; on the contrary, the evidence did show that the property in possession of defendant Blair, a competent newspaperman of many years' experience, had been improved, necessary repairs made, and the size of the newspaper increased from four to eight pages. It is only in cases of the greatest emergency that courts are warranted in tying up a business or property by appointing a receiver to take it from the control of the owners; neither should a receiver be appointed unless it is absolutely necessary and there is no other adequate remedy. A receiver should never be appointed where it may do irreparable injury to others or where greater injury is likely to result from such appointment than if none were made. (*Feess v. Bank,* 84 Kan. 828, 115 Pac. 563.)

The question raised by the second appeal is, did the court err in overruling the separate demurrers of defendants Blair and the Kings to the amended petition. Separate motions to strike certain portions of the original petition were filed and overruled. Separate motions to make more definite and certain were filed by Blair and the Kings, and were sustained *in toto.* Paragraphs 1 to 6 and 10 to 13 inclusive of the original petition were included in the amended petition, and the contents having been heretofore related will not be repeated.

Plaintiffs by amendment in compliance with the court's order state in substance in paragraphs 7 to 10 of the amended petition: Paragraph 7, that Orrin L. Browning, age 58 years, became sick and ill both in mind and body, which sickness became acute in December, 1948, and continued until June, 1949, during which time he suffered a severe secondary anemia due to a bleeding of the lower bowel and rectum, heart irregularity, and severe headaches; he was in extreme pain both from hemorrhoids and the injection treatments being administered. As a result of such physical condition, extreme pain and suffering, he became nervous, weak, despondent, and mentally unstable. In paragraph 8, plaintiffs allege that as a result of plaintiff Orrin L. Browning's mental condition, for a period of thirty days prior to December, 1948, and continuing to May, 1949, he was unable to work and produce revenue and income and relinquished possession and control of the newspaper; that he incurred certain obligations in connection with the newspaper business, and during a period from November, 1948, to May, 1949, plaintiffs were being pressed for payment of such obligations by their creditors, including the Kings, defendants. In the 9th paragraph, plaintiffs state that defendant Blair made overtures to purchase the newspaper business from them in the summer of 1948; that he inspected the newspaper plant during the negotiations; that Orrin L. Browning quoted to Blair a price of $16,500 for the newspaper plant and physical assets; after plaintiffs had entered into an extension agreement and renewal contract with the Kings on October 30, 1948, defendant Howard C. King advised Browning on the following day that he had talked with Blair, who offered to purchase said newspaper plant and physical assets for $11,000, and King then and there told Browning he had better sell to Blair at that price. In a later conversation, King advised Browning that Blair had increased his offer to $11,500, and again told Browning he had better take that price. In April, 1949, King notified plaintiffs he was going to take over the newspaper plant by repossession, whereupon Browning wired King asking the amount required to pay in full the amount due under the contract; King replied by telephone advising Browning he must have the full amount due under the contract plus interest and a further sum of $500, and that all such amounts must be paid on or before the day following their conversation. Browning asked for 48 hours' time in which to raise the required amount, but his request was refused. King at this time advised Browning he had talked with Blair and

Blair would buy the newspaper plant at a figure unnamed. Following this telephone conversation, Browning called Jim Reed of Chetopa and asked him to have Blair come in to see him. On the following day Blair made an offer to purchase the newspaper plant from the Brownings for $8,500, at that time stating to the Brownings: "You understand I wouldn't have to pay you anything. I could get the paper for the amount against it plus attorney fees, I'm given to understand." Plaintiffs further allege that Orrin L. Browning being then and there physically ill, suffering extreme physical pain, despondent and in an unstable mental condition, accepted said offer, stating to Blair: "I guess I have no other choice." That as a result of the conspiracy entered into between Blair and the Kings as above set forth, and plaintiff Orrin L. Browning being oppressed by his creditors insisting upon payment of their accounts, plaintiffs were induced to enter into a contract for sale of their equitable interest in said newspaper plant, premises and physical assets for the sum of $8,500; that said sale agreement was made and entered into on April 25, 1949, a copy thereof being attached to the original petition marked exhibit "C" and made a part of the amended petition.

Does the amended petition state facts sufficient to constitute actionable fraud or conspiracy? The words fraud and conspiracy alone, no matter how often repeated in a pleading, cannot make a case for the interference of a court of equity until connected with some specific act for which one person is in law responsible to another; they have no more effect than other words of unpleasant significance. (*Stoner v. Wilson*, 140 Kan. 383, 36 P. 2d 999; *Rogers v. J. R. Oil and Drilling Co.*, 149 Kan. 807, 89 P. 2d 847; *Sullivan v. Paramount Film Distributing Co.*, 164 Kan. 125, 187 P. 2d 360.) Before there can be a civil action for conspiracy, the pleader must plead facts which establish the elements required as a matter of law. And by a complete failure to plead any unlawful act or acts, this amended petition must fall as to the conspiracy. It is apparent the court sustained the motion to make more definite and certain in the first instance because the original petition contained no such allegations, and the amended petition has not cured that defect.

The allegation of fraud set forth in the amended petition is based on the fact that King stated he was going to take over and repossess the newspaper plant because plaintiffs were in default on their conditional sales contract by more than four payments and were over two years in default on the payment of taxes, and the contract was

therefore subject to foreclosure. We have held that it is not duress to bring or threaten to bring an action to enforce a valid obligation —to do that which a party has a legal right to do. And where one obtains a bill of sale on a threat to cause an attachment to be levied on the land of the debtor, it does not constitute such duress as would enable the debtor to avoid the contract. (*Shelby v. Bowman*, 64 Kan. 879, 68 Pac. 1131; *Banking Co. v. Veale*, 84 Kan. 385, 114 Pac. 229.)

Plaintiffs contend the consideration was grossly inadequate to support the contract of sale to Blair. However, the petition alleges plaintiffs purchased this property on a conditional sales contract from the Kings in January, 1945, for a consideration of $7,500; that they had possession and operated the newspaper over a period of years up to and including the 25th day of April, 1949; that they made some improvements and made a few payments under the contract; that they were in default both for payments on the contract and for taxes; and they resold the paper in 1949 to defendant Blair for $8,500. Mere inadequacy of consideration is not enough in itself to warrant equity in assuming jurisdiction for the purpose of canceling an instrument, for chancery lacks the power and will refuse to relieve a party from the effects of an injudicious, hard, unfortunate, or improvident bargain where there has been no fraud or imposition, where it was entered into with full knowledge of all the facts and where the situation is such that the parties can form independent judgments or understand fully the nature of the transaction. A court of equity will not assume power to administer justice because of the hardship of the case or the failure of a party's remedy at law. Nor does equity relieve parties from bargains because they are hard, oppressive or unprofitable, or because anticipated profits have not been derived therefrom. (9 Am. Jur. 371; 19 Am. Jur. 57.)

Nowhere in plaintiffs' amended petition do they state that by reason of Browning's illness, his mind was affected to such an extent that he was unable to comprehend his acts or the results thereof. And no place in the petition is it contended that any disability existed in the mind or body of his co-owner and co-plaintiff, Rosalee M. Browning, or that any undue advantage was taken of her. She signed the conditional sales contract, the extension agreement, and the contract of sale to Blair. Plaintiff Orrin L. Browning had the benefit of her advice and wisdom prior to signing the sales con-

tract with Blair. This court has said that it is the duty of one who signs a written contract to. know the contents thereof and that he should be bound by its terms in the absence of any false representations made to him as to its contents. (*Lumbar v. Erickson*, 126 Kan. 31, 266 Pac. 737.)

Plaintiffs' amended petition shows clearly that the Kings had extended to plaintiffs every opportunity to comply with the original conditional sales contract and extension agreement thereto; the amended petition further discloses that they were about to lose their newspaper because of their indebtedness, not to the Kings alone, but to other persons who had no connection with the defendants in this proceeding, and that in order to save any equity in the property, they made the sale to Blair. No place within the four corners of the petition are any facts alleged on which fraud or conspiracy could be based or even inferred.

The case is reversed and remanded with directions to the court to set aside the appointment of the receiver and to sustain defendants' demurrers to the amended petition.